MAITLAND v. ARCHER & PANCOAST CO.

(Circuit Court, S. D. New York. March 10, 1896.)

PATENTS—ELECTRIC LIGHT FIXTURES.

The Stieringer reissue, No. 11,478 (original No. 259,235), for an electrical fixture, held void as to claims 4 and 5 (following Maitland v. Gibson, 11 C. C. A. 446, 63 Fed. 840, which held certain claims of the original patent invalid). But held, further, that claim 1 of the reissue, which covers a combination consisting of (1) a metallic fixture for electric lights containing insulated conducting wires; (2) an insulated joint at the upper or inner end of the fixture, and having metallic coupling portions and an intermediate section of insulating material; and (3) the grounded gas piping of the house by which the chandelier is supported,—covers an invention of considerable merit, being the first practical device for utilizing the existing gas-pipe systems for the purpose of electric lighting.

Final Hearing in Equity.

This action is founded on reissued letters patent, No. 11,478, granted March 12, 1895, to Luther Stieringer, assignor to complainant, for an improvement in

electrical fixtures. The original, No. 259,235, was dated June 6, 1882, and was applied for March 15, 1882. Claims 1, 7, 8 and 9 of the original were before the court in the Eastern district of Pennsylvania in Maitland v. Gibson, 63 Fed. 126, and were held to be invalid. The decision of the circuit court was affirmed by the circuit court of appeals for the Third circuit upon the opinion of the circuit judge. 11 C. C. A. 446, 63 Fed. 840.

The first claim of the original patent was as follows: "A fixture for electric lights, supported from the piping of a house and electrically insulated therefrom, substantially as set forth." The court held that this claim contained three elements. First, a fixture for electric lights, second, the piping of a house, and, third, means for electrically insulating the fixture from the piping. That the third element included every kind of insulating device by which two conducting bodies may be mechanically united and yet electrically separated and that the claim was too broad and, therefore, void. Claims 7, 8 and 9 were held to be subsidiary and void as mere aggregations plainly obvious to the skilled workman.

The opinion contains the following allusions to the Stieringer joint: "The patentee, in his specification, fully and particularly described a particular insulating joint, and to it, I think, he must be restricted. * * * The utmost which it can plausibly be contended Stieringer did, which had not been precisely done before,—and the assumption of this, except for the argument's sake, the ferryboat exhibit repels,—was to insert an insulating joint between the piping of a house and a fixture for electric lights. This is the essence of his asserted combination. But similar insulation in analogous situations had been extensively practiced before, and apart from his peculiar joint, which it may be conceded was new, I am unable to perceive that his alleged invention amounted to anything more than electrically parting, while physically connecting, two pieces of metal, by a use of the familiar expedient of insulation. * * * As has already been said, his title to the specific joint may be admitted; but when he seeks protection for a combination, irrespective of the kind of joint comprised in it, it is not enough for him to show that his peculiar joint was invented prior to the conflicting use. He should show an earlier date for the combination alleged and this he had utterly failed to do." The complainant construed this decision as saving the insulating joint, if limited to the precise combination shown, and, upon this theory, applied for the reissue.

So far as relates to the present controversy the object of the patentee, as stated in the specification, was to utilize the support afforded by the gas pipe of a house for sustaining metallic fixtures for electric lighting containing insulated conducting wires so arranged that the proper connections can be cheaply and conveniently made. He accomplishes this object by carrying the conducting wire from the ceiling, by proper connections, down through the main stem and arms of the chandelier, which may be used also for gas lighting; and is provided with two or more arms and an ornamental shell which hides the wires and connections from view. At the upper end of the chandelier is an insulated joint which separates the chandelier, electrically, from the grounded piping of the house. The electrical insulation of the fixture from the supporting pipe is as applicable to wall brackets as to chandeliers. The claims, read in connection with the foregoing, sufficiently describe the improvements.

The claims involved are 1, 2, 4 and 5. They are as follows:

"(1) A fixture for electric lights constructed wholly or largely of metal and provided with insulated conducting wires for conveying current to and from the lamps carried thereby, in combination with a joint or section having metallic coupling portions and an intermediate section of insulating material electrically insulating the metallic coupling portions from each other, such joint being located at the upper or inner end of the fixture and serving to electrically insulate the fixture from the grounded piping of a house by which it is supported, substantially as set forth.

"(2) In a fixture for electric lights adapted to be supported from the grounded piping of a house, the combination with the hollow metal stem, of insulated conducting wires passing therethrough for conveying current to and from the lamps carried by the fixture, a joint or section located at the upper or

inner end of such hollow metal stem, comprising metallic coupling portions and an intermediate section of insulating material electrically insulating the metallic coupling portions from each other and provided with lateral openings for permitting the said conducting wires to pass out of the hollow stem for connection with the ceiling wires, substantially as set forth."

"(4) In an electric light fixture, the combination with the hollow main stem, a distributing body and open section supported thereby, and two or more lamp-carrying arms supported by said distributing body, of insulated main conducting wires passing through such hollow main stem and through said open section, a pair of insulated arm wires passing through each of said lamp-carrying arms, said main and arm wires being directly connected together, and a central support from said open section for sustaining ornamental parts of the fixture, substantially as set forth.

"(5) In an electric light fixture adapted to be supported from the grounded piping of a house, the combination with the hollow main stem, a distributing body and open section and lamp-carrying arms, constructed of metal, of insulated main conducting wires passing through said main stem and through said open section, a pair of insulated arm wires passing through each of said lamp-carrying arms, said main and arm wires being directly connected together, an open and insulating joint or section at the upper or inner end of said main stem comprising metallic coupling portions and an intermediate section of insulating material, adapted to connect the fixture mechanically with, and to electrically insulate it from, the grounded piping of a house and permitting the said main conducting wires to pass out of said hollow main stem for connection with the ceiling wires, and a central support from said open section for sustaining ornamental parts of the fixtures, substantially as set forth."

The defenses are noninfringement, want of novelty and invention and invalidity of reissue as being for a different invention from the original.

Richard N. Dyer and Daniel H. Driscoll, for complainant.
Hector T. Fenton, for defendant.

COXE, District Judge (after stating the facts as above). The court cannot consider this controversy de novo. Many of the questions which are now debated were decided in the Pennsylvania case. 63 Fed. 126; Id., 11 C. C. A. 446, 63 Fed. 840. As to these the doctrine of stare decisis is applicable.

Claims 4 and 5 of the reissue need not be considered anew. As to them the discussion is closed, certainly so far as this court is concerned. No one can read what is said regarding claims 7, 8 and 9 of the original without being convinced that the claims now under consideration would have shared the same fate had they been before the court. As to these claims nothing was reserved. They were held invalid because they were mere aggregations and contained nothing which would not have occurred to any one familiar with the art of electric lighting. I am inclined to think, too, that this reasoning applies to the second claim of the reissue which is the same as the first except that the insulating joint is provided with lateral openings to permit the wires to pass out of the stem and connect with the wires in the ceiling. It will very much simplify this discussion if it be confined to the first claim of the reissue which contains the essence of Stieringer's invention. The fact that the patent has been reissued, that the original patent has been construed by the court, that in the various proceedings in the courts and the patent office arguments have been advanced on both sides not wholly consistent with present contentions; all this, in connection with the voluminous

record and multitude of exhibits, makes the case a most bewildering and perplexing one at best. If the paramount and fundamental issue can be rescued from this maze of disputed propositions it will be a long step towards arriving at the ultimate rights of the parties. The discussion of subordinate questions may then become unnecessary, at least at the present time.

It may fairly be said that the questions relating to the combination of the insulating joint, the house piping and the metal gas fixture are left open by the decisions in the Pennsylvania circuit. Even this is disputed, but the language of the court is susceptible of an interpretation in consonance with complainant's view, which, it would seem, is more consistent than the one contended for by the defendant, which limits the patent to a Chinese reproduction of the joints shown. It is impossible to limit the patent to one form of joint because the drawings show three forms differing from each other as widely as the defendant's joint differs from some of them. If the joint shown at Fig. 8 is the equivalent of the one at Fig. 4 it is not easy to see why the defendant's joint is not also an equivalent. To restrict the patent to the precise form of joint covered by the third claim of the reissue is to defeat it for all useful purposes, because a mere tyro in electric lighting would know enough to change the joint in some minute particular and thus escape infringement. No patent should be strangled by such a harsh construction unless the prior art compels it. Nothing in the present record requires such a construction. If Stieringer did nothing more than improve an old joint and put it back in its well-known environment he is wholly out of place in this court; but to assert this is, according to my understanding of the record, to proceed upon an entire misapprehension of Stieringer's achievement. The Pennsylvania court had before it a claim broad enough to cover any form of insulating joint and any form of fixture, and it decided, in view of what had been done before, that this claim was invalid. It does not follow that a claim limited to cover what Stieringer actually did is invalid or would have been held invalid in the Gibson Case. Such a claim was not before the court and was not passed upon.

Proceeding, then, upon the hypothesis that the first claim, assuming the reissue to be properly granted, is still open to discussion, the questions to be answered are: Did the conception of an insulating joint for the purpose indicated originate with Stieringer? Did this involve invention? Does the defendant infringe? A study of this record has convinced me that Stieringer was the first to make the use of gas chandeliers a practical success in the art of electric lighting. The prior structures were not only dangerous, but awkward and ungainly. Stieringer's is absolutely safe, and, at the same time, the symmetry and graceful contour of the fixture is preserved. When the conditions surrounding the genesis of electric lighting are remembered it can hardly be denied that the man who yoked the new art to the old, and fully developed the art of electric lighting was something more than a mechanic. It is plain that he who utilized for electric lighting the expensive and intricate gas-pipe systems then existing and the fixtures which embodied a multitude of graceful designs took

a long forward step. He made electric lighting cheap, convenient, simple and safe. Of course it is not pretended that Stieringer was the first to use gas piping and fixtures in this art, but it is thought that he was the first to make the use of an internally wired metal fixture absolutely safe. If any one did this before Stieringer the record does not disclose his name. The defendant hardly does justice to Stieringer's achievement when it is asserted that it involved merely the use of an insulating joint. Grant that with the idea of putting insulation at the ceiling joint of an internally wired fixture clearly before him, it required nothing but ordinary skill for the workman to carry out the idea, can it be said that it required no exercise of the inventive faculties to conceive and carry out the idea? A number of accomplished inventors were at work on this very problem. They accomplished nothing. Stieringer succeeded. His combination is in use to-day precisely as he embodied it. There have been some incidental mechanical changes, but the substance is the same. It is not an unreasonable presumption that one who succeeds in doing what so accomplished an inventor as Edison failed to do, is on a distinctly higher plane than a mechanic. Not only did Edison fail himself, but he was among the first to recognize the merits of the invention practically as well as theoretically, for his firm took a license under Stieringer's patent. So did the defendant in the Pennsylvania case, the defendant in this case and afterwards, substantially, the entire art. The importance of the patent was conceded and acquiescence was well-nigh universal. All this is wholly inconsistent with the theory that the patentee's contribution was perfectly obvious and without patentable merit. The history of the art from 1882 is a refutation of this proposition. Stieringer's joint located at the ceiling seems to be regarded as one of the absolutely essential features where an internally wired metal fixture is used. If not essential why should the defendant and all other manufacturers be so strenuous about its use? They can omit it, or locate it elsewhere in the system, with perfect impunity. It is not pretended that any of the prior patents anticipates; many of them, though relating generally to electric lighting, do not deal with the heavy and dangerous currents from the dynamo, but with feeble currents in branches of the art entirely distinct from the one now under consideration. Aggregated they would not show a skilled workman how to utilize the existing gas fixture. The ferryboat exhibit is unquestionably the best of defendant's references. Irrespective of the question whether it was prior to the conception of Stieringer's invention, and of this there is grave doubt, it is thought that it can only be regarded in the light of an experiment that was tried, proved to be an utter failure and was abandoned. If this had been the only contribution to the art, electric lighting, in the particulars mentioned, would not have advanced a step. It was dangerous and inefficient. It accomplished nothing. After a trial of two or three months it was abandoned. During this time the joints leaked gas and broke in two. The chandelier was held by the wires alone and was in danger of dropping on the heads of the passengers. Some of the very dangers which Stieringer sought to avoid were inherent in this structure. Perhaps its principal vice

was the employment of the metal of the chandelier as part of the conducting circuit. It was a one-wire system. The witness who wired the fixture, who was then a machinist and is now a butcher, describes it fully and accurately. He says, among other things, that it was wired "partly inside and partly out. One wire was inside from the ball joint at the top, the ground wire was soldered onto the pipe; it came through the upper deck overhead and was soldered just below the insulating joint, and that ended it. The other wire ran alongside the pipe and inside the casing from the wooden canopy down to this other wooden bell and then out through and around the wooden bell and then the branch wires were soldered onto the main wire down to the lamp." It is not surprising that such a structure was a complete illustration of "how not to do it." It was an embodiment of irredeemable inefficiency. Short circuits were formed, a wire would ground on the gas pipe and the lights would go out. The pipe was burned, a hole was burned through the brass canopy, the wires were burned off in the tubing and the joints were wholly inadequate. The structure proved an utter failure, the joints were discarded and the wires placed on the outside. A meritorious invention should not be defeated upon such proof. In fact, the ferryboat fixture is an indirect tribute to the value of Stieringer's invention. It exhibits the kind of work to be expected of a skilled mechanic even after the insulating joints were placed in his hands. The mechanic failed. The inventor succeeded. In short, I cannot resist the conclusion that Stieringer made an invention of considerable merit, and, this being so, the court, of course, is anxious to give him protection commensurate with his achievement. To confine the invention to some specific form of joint is, as before stated, tantamount to saying that the inventor has done nothing at all. He was not working to improve an insulating joint. He was working to improve the art of electric lighting by cutting off electrically the piping of the ceiling from the metal of the chandelier. To do this he required an insulating joint to be sure, but it was only one of the elements, which, when inserted at the ceiling made the combination successful. It was this conception which made the valuable contribution to the art. The shops might have been filled for years with joints of this character and the art would not have progressed a step. What did advance the art was placing a joint having these characteristics at the ceiling in the manner described. When that was done a combination was created where every element acts upon every other and all are necessary to produce the desired result; in short, a combination having the per my et per tout characteristics. The combination is a limited one, it is true; much more so than the claim of the original patent, but it is properly covered by the first claim of the reissue. That claim is for a combination having the following elements: First. A metallic fixture for electric lights containing insulated conducting wires. Second. An insulated joint located at the upper or inner end of the fixture and having metallic coupling portions and an intermediate section of insulating material. Third. The grounded piping of a house by which the chandelier is thus supported. The elements, broadly speaking, are the fixture, the joint and the piping, but the

'limitations are important and clearly distinguish this claim from the first claim of the original. The fixture must be metallic in whole or in part, it must contain the conducting wires, which are to be covered with insulation and hidden from view. The joint must be of three parts; two metal coupling portions and an intervening washer of insulation. It must be located at the upper or inner end of the fixture. The piping must be grounded. The claim so limited is no broader than the invention. That the claim so construed is infringed by the defendant's fixtures is not disputed. Noninfringement is only based upon a construction which limits the complainant to a joint like that covered by claim 3, and, as already stated, such a construction cannot be given without manifest injustice to the complainant.

The only other question relates to the reissue. Still confining the discussion to the first claim it seems too plain for argument that it is much narrower than the first claim of the original. None of the limitations above referred to is in the latter. The claim of the reissue is fully sustained by the original specification and drawings. As soon as the complainant was informed by the final decision of the court that his claim was too broad he applied for a reissue limiting it to what he thought the court had left in his possession. Of course no structure would infringe the claim under consideration that would not infringe the broad claim of the original, and no intervening equities have arisen. In such circumstances I know of no authority compelling a ruling that the reissue is void. It follows that as to the first claim of the reissue the complainant is entitled to the usual decree.